# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ALLEN FILLINGIM, | ) | CASE NO.  5:12-cv-01816 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| | ) | |
| CENTRAL STATES, SOUTHEAST | ) | |
| AND SOUTHWEST AREAS | ) | |
| PENSION FUND, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This matter is before the Court on cross-motions for judgment on the administrative record[1] filed by plaintiff Allen Fillingim ("plaintiff" or "Mr. Fillingim") (Doc. No. 21) and defendants the Central States Southeast and Southwest Areas Pension Fund (the "Fund"), nine individual Trustees of the Fund,[2] and the individual Plan Administrator (collectively, the "individual defendants") (Doc. No. 20), as well as a motion for partial judgment on the pleadings[3] filed by all defendants (Doc. No. 19). The

---

[1] Plaintiff's motion is titled "Motion for Summary Judgment." In this circuit, however, a procedural framework has been put in place for ERISA actions that calls for judgment on the administrative record, not summary judgment procedures. *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). The Court reiterated this fact to the parties in its Case Management Conference Scheduling Order of September 4, 2012. (Doc. No. 12 at 150.) In effect, though, plaintiff has briefed the issues in accordance with the *Wilkins* framework.

[2] Plaintiff indicates in his motion that defendant Howard McDougall, a former trustee of the Fund, died on January 21, 2012, and that the parties have stipulated to his dismissal. (Doc. No. 21 at 997 n.1.) However, the Court has not received a motion for an order dismissing Mr. McDougall, as required under Rule 41(a) of the Federal Rules of Civil Procedure. Nevertheless, because the Court's disposition of the instant matter is to dismiss the case in its entirety, the late Mr. McDougall, as with all of the other defendants, is no longer a party to this case.

[3] Defendants seek judgment on the pleadings only as to Count II of plaintiff's complaint. (Doc. No. 19-1 at 540.)

parties have filed simultaneous briefs in opposition (Doc. Nos. 24–26) and in reply (Doc. Nos. 27–29).[4] The matter is ripe for consideration. For the reasons that follow, defendants' motion for partial judgment on the pleadings is **GRANTED**, defendants' motion for judgment on the administrative record is **GRANTED IN PART AND DENIED IN PART AS MOOT,** and, plaintiff's motion for judgment on the administrative record is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Mr. Fillingim's Employment History

Mr. Fillingim began working for Roadway Express Corp. ("Roadway") in 1978. (Administrative Record ["AR"], Doc. No. 18-3, at 437.) In December 2003, Roadway was acquired by Yellow Corporation, and Yellow Roadway Corporation ("YRC") was formed. (Compl., Doc. No. 1 at ¶ 10; Answer, Doc. No. 10 at ¶ 10.) While working at YRC, Mr. Fillingim was represented by Akron Local 24 of the International Brotherhood of Teamsters ("Teamsters"). AR at 437. Pursuant to collective bargaining agreements ("CBAs") between YRC and the Teamsters, Mr. Fillingim became a participant in the Fund. AR at 439–41. Mr. Fillingim worked for YRC and was represented by the Teamsters continuously until he retired on November 1, 2010. AR at 532.

### B. The Fund

The Fund is a multi-employer pension plan created under an Agreement and Declaration of Trust established on March 16, 1955. (Doc. No. 1 at ¶ 4.) The creators

---

[4] Defendants also filed an unopposed motion to supplement with additional authority issued after the close of briefing. (Doc. No. 30.) That motion is **GRANTED**.

of the Fund were the Teamsters and several employer associations that employed Teamsters under CBAs, which required contributions to the Fund on their behalf. (Doc. No. 1 at ¶ 4.) The Fund is managed by the defendant Trustees and the defendant Plan Administrator. (Doc. No. 1 at ¶ 4.) AR at 186–87. The Trust Agreement gives the Trustees discretion in deciding claims for benefits, adopting and constructing rules and regulations for administration of the Fund, and construing Fund plan documents. AR at 196, 200–01.

**C. The Fund Enters "Critical Status"**

On April 8, 2008, the Fund sent plaintiff and other participants a letter notifying them that the Fund was in "critical status."[5] AR at 457. The letter indicated that the Fund's Rehabilitation Plan "*may* result in the elimination of . . . 'adjustable benefits' for certain participants. Those benefits include early retirement benefits such as the 'And-Out' benefits, disability benefits, and the ability to receive a pension prior to age 65." AR at 457 (emphasis in original). Continuing, the letter stated, in bold type, that the "mere fact that you have received this notice does not mean that your adjustable benefits have been eliminated or reduced. In the event that your adjustable benefits are eliminated or reduced in the future, you will receive a separate notice." AR at 457. Along with the letter, the Fund included a "Notice of Critical Status" further explaining the issue. AR at

---

[5] Under ERISA, a plan is in critical status if it is less than sixty-five percent funded. 29 U.S.C. § 1085(b)(2)(A)(i). If a pension plan is in critical status, a plan sponsor must notify participating employers and unions of that status on a yearly basis. 29 U.S.C. § 1085(b)(3)(D). In addition, if a multi-employer plan enters critical status, the plan sponsor must adopt a Rehabilitation Plan to restore the Fund's financial status. The Rehabilitation Plan must set forth new schedules of revised benefits and contributions, from which participating employers and unions may chose when it is time to negotiate successor CBAs. 29 U.S.C. § 1085(e).

3

459. In April 2009, the Fund sent a substantially similar letter and Notice of Critical Status to plaintiff and the rest of the participants, along with an annual funding notice showing the percentage to which the Fund was funded. AR at 461.

## D.  YRC is Terminated from Participating in the Fund and Negotiates with the Teamsters to Rejoin

In July 2009, the Fund sent a letter to plaintiff and former or current YRC employees, notifying them that YRC was terminated from participation in the Fund effective July 9, 2009. AR at 470. The letter stated that, "[a]t this time, there will be no change to benefits already accrued by participants employed by [YRC]. However, further development (such as the failure of [YRC] to resume participation in the [Fund]) may necessitate a reevaluation of the benefits available to those participants employed (or formerly employed) by [YRC]." AR at 470. The letter also mentioned a "memorandum of understanding" between YRC and the Teamsters, "which requires the resumption of participation in, and contributions to, the [Fund] at some point in the future." AR at 470.

In April 2010, the Fund sent YRC participants another letter, notice of critical status, and annual funding notice. AR at 472. The letter included a reminder that YRC was no longer participating in the Fund, that "no contributions have been paid on your behalf" as of July 9, 2009, but that "no previously accrued benefits have been lost as of this time." AR at 472. In addition, the letter stated, "[a]s you may be aware, YRC and the [Teamsters] entered into an agreement to resume participation in the [Fund] effective January 1, 2011," but the Fund explicitly refused to "guarantee that YRC will resume participating in the [Fund] at that time." AR at 472.

4

**E. Mr. Fillingim Makes Preparations to Retire from YRC**

On July 28, 2009, Mr. Fillingim filed a pension application form without naming his retirement date. AR at 436. On August 26, 2009, the Fund communicated in a letter to Mr. Fillingim that his estimated monthly benefit, effective September 2009, was $3,067.90. AR at 536. That letter reiterated that the Fund was in critical status and that "there can be no guarantee that the indicated pension amount will not be reduced or eliminated . . . ." AR at 536.

On September 24, 2010, YRC and the Teamsters entered into a Restructuring Plan that provided that YRC would resume participation in the Pension Fund on June 1, 2011, but at a significantly reduced contribution rate. In response to learning that YRC wanted more "concessions" from its employees, Mr. Fillingim decided to make that day (September 24, 2010) his final day working at YRC. AR at 412–13. He used his final sick day for September 25, 2010, and asked to use vacation time until November 1, 2010, on which date he would retire. AR at 413. On October 26, 2010, Mr. Fillingim filed a retirement declaration form indicating that November 1, 2010 would be his retirement date. AR 537.

**F. The Fund Issues a Special Bulletin**

While Mr. Fillingim was using his remaining vacation time pending his selected retirement date, on October 1, 2010, the Fund issued a Special Bulletin (the "Special Bulletin") to all local unions with YRC participants, with the subject line:

"[YRC] Restructuring Plan."[6] AR 481. In its entirety, the body of the Special Bulletin

reads as follows:

> Over the last several days we have received inquiries from many local
> unions regarding the impact on our members pension benefits if the
> Agreement for the Restructuring of the YRC Worldwide, Inc. Operating
> Companies between [YRC] and [Teamsters] ("Restructuring Plan") is
> ratified. As the details of the Restructuring Plan were recently released,
> the [Fund's] Trustees will need time for our financial consultants to
> review the company's books and records to independently verify that both
> the delay in reentry into the [Fund] and the contribution rate reductions of
> the magnitude set forth in the Restructuring Plan are necessary. If it is
> determined that the delay in reentry and the contribution rate reductions
> are justified by the company's financial condition, the Board of Trustees
> must then perform an actuarial review of the impact of the contribution
> suspension coupled with the rate reductions in order to determine what
> benefit modifications are warranted.
>
> Clearly, benefit reductions will result from the nearly two year suspension
> in contributions followed by a 75% reduction in the contribution rate. (The
> normal retirement benefit at normal retirement age will not be affected
> under any circumstance.) However, while no decisions regarding benefit
> modifications will be made for some months to come, it is our firm
> opinion that benefit reductions in the event of a [YRC] bankruptcy would
> likely be greater than any benefit reductions associated with a resumed but
> reduced contribution rate as currently set forth in the Restructuring Plan.
> Under no circumstance do we recommend that any member make a
> retirement decision based on the assumption that they can avoid the
> impact of a benefit modification by retiring before the ratification of the
> Restructuring Plan. Any benefit modification will be applied uniformly
> and retroactively to all retirement applications received after a date not
> later than (and perhaps much earlier than) the September 24, 2010
> effective date of the Restructuring Plan.
>
> If you have any questions regarding this Special Bulletin, please contact
> your Field Services Representative at 1-800-323-2152, extension 3036.

---

[6] The Restructuring Plan, an agreement between the employer (YRC) and the union (the Teamsters), is not
to be confused with a Rehabilitation Plan, which is a proposal provided to bargaining parties by the plan
sponsor. It is the latter that triggers notice requirements for the Fund pursuant to the PPA (29 U.S.C. §
1085). As defendants' observe, the Fund provided all legal notices required pursuant to the PPA.

AR at 481. The Special Bulletin was posted in a break room at YRC but not sent to individual YRC participants. AR at 413.

**G. After His Retirement, Mr. Fillingim is Notified of a Reduction in His Pension Benefit**

It was not until March 2011 that the Trustees of the Fund approved the Restructuring Plan, formulated benefit modification rules, and approved YRC's re-entry into the Fund at a reduced contribution rate. On March 30, 2011, in accordance with the notice requirements in the PPA, specifically, 29 U.S.C. § 1085(e)(8)(C)(i), the Fund issued a letter to YRC participants summarizing the Restructuring Plan between YRC and Teamsters, the Trustees' approval of the Restructuring Plan, and the benefit modifications that would result. AR at 482. In April 2011, the Fund sent a personalized letter to Mr. Fillingim, to which several documents were attached, including a notice of benefit reduction specific to Mr. Fillingim, a benefit election form, a notice of critical status, and a notice of plan amendments. AR at 488. The letter stated that "[a] currently retired participant with a retirement date on or after September 24, 2010 shall have all adjustable benefits . . . eliminated and any pre-age 65 retirement benefits are reduced." AR at 488. The notice of benefit reduction specified that, effective July 1, 2011, Mr. Fillingim's monthly pension benefit would decrease from $3,117.96 to $1,859.30. AR at 491. It also stated that Mr. Fillingim's benefit would not be reduced if he suspended receiving his benefit until he turned 62 years of age. AR at 491.

**H. Mr. Fillingim Exhausts His Administrative Appeals of the Benefit Reduction**

On May 19, 2011, Mr. Fillingim appealed the reduction of his pension benefit to the Fund's Benefits Claim Appeals Committee (the "Appeals Committee"). AR

7

at 423. He attached a letter outlining his decision to make September 24, 2010 his last day at YRC and to retire on November 1, 2010. AR at 424. Regarding the Special Bulletin, Mr. Fillingim wrote that, because he was on vacation when it was posted in the YRC break room, he never saw it, that "something this important should have been mailed to the membership," and that, had he "known that September 24, 2010 was going to adversely affect my retirement, I would have stayed on the job until age 62 . . . ." AR at 424–25.

On May 13, 2011, Mr. Fillingim elected to receive the benefit at the lesser amount immediately, rather than suspend payment of the benefit to a later date. AR at 426.

On June 9, 2011, the Appeals Committee issued its determination that Mr. Fillingim was not entitled to retain his adjustable benefits beyond July 1, 2011, citing the Fund's April 2011 letter explaining the reduction in benefits and Mr. Fillingim's decision on the benefit election notice not to postpone payment of his pension benefit. AR at 421.

On June 20, 2011, Mr. Fillingim appealed to the Trustee Appellate Review Committee (the "Appellate Review Committee"), reiterating his concern about not having seen the Special Bulletin. AR at 420. Mr. Fillingim and his wife, Nancy, personally presented his appeal before the Appellate Review Committee on September 13, 2011. After presentation and discussion, the Trustees voted to deny Mr. Fillingim the retention of his adjustable benefit, concluding that he "was provided with complete, accurate, and timely information concerning the [p]lan's eligibility rules and his status under those rules." AR at 412–17.

8

### I. Mr. Fillingim Files Suit in This Court

On July 16, 2012, Mr. Fillingim filed suit against defendants in this Court, asserting two causes of action: In Count I, asserted against only the Fund, plaintiff alleges a violation of 29 U.S.C. § 1024(b)(1) for failure to notify him of plan amendments contained in the Special Bulletin, and in Count II, asserted against all individual defendants, plaintiff alleges breach of fiduciary duty, also for allegedly failing to notify him of material changes to the plan.

## II. STANDARD OF REVIEW

### A. Motions for Judgment on the Administrative Record

In *Wilkins v. Baptist Healthcare Sys., Inc.*, the Sixth Circuit developed a framework for district courts to employ in adjudicating an ERISA action:

> 1. As to the merits of the action, the district court should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.
>
> 2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.
>
> 3. For the reasons set forth above, the summary judgment procedures set forth in Rule 56 [of the Federal Rules of Civil Procedure] are inapposite to ERISA actions and thus should not be utilized in their disposition.

150 F.3d 609, 619 (6th Cir. 1998); *see also Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 420 (6th Cir. 2006) ("The *Wilkins* panel foresaw occasions in which the procedural

process of gathering all pertinent information may have broken down at the administrative level and directed the courts to permit discovery in those cases.").

The decision of an ERISA plan administrator to deny benefits is reviewed *de novo* unless the benefit plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where there is a clear grant of discretionary authority to the plan administrator under the terms of the plan, the court applies an "arbitrary and capricious" standard of review to the administrator's decision to deny benefits. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011) (citing *Firestone*, 489 U.S. at 115).[7] In this case, the parties agree that the terms of the plan clearly grant discretionary authority to the administrator. (Doc. No. 20-1 at 567; Doc. No. 21 at 1006.) Accordingly, the Court will apply the "arbitrary and capricious" standard.

Under the arbitrary and capricious standard, a district court must affirm the decision of the administrator if the record evidence establishes a reasonable basis for the decision. *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693–94 (6th Cir. 1989). The

---

[7] In *Loan v. Prudential Ins. Co. of America*, 370 Fed. App'x 592, 594 n.1 (6th Cir. 2010), an unpublished decision from the Sixth Circuit, the court wrote in a footnote that the proper standard of review was "abuse of discretion," citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Recognizing that prior Sixth Circuit cases applied an "arbitrary and capricious" standard, the court in *Loan* stated that, "in *Glenn*, the Supreme Court made clear that a court reviewing a decision made by a plan administrator with discretionary authority should apply the highly deferential abuse of discretion standard." *Id.* Subsequent published decisions of the Sixth Circuit, however, have continued to apply the "arbitrary and capricious" standard. *See, e.g.*, *Farhner*, 645 F.3d at 342; *Price v. Bd. of Trs. of Ind. Laborer's Pension Fund*, 707 F.3d 647, 651 (6th Cir. 2013); *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010); *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010). Moreover, this Court is not aware of a published Sixth Circuit decision post-*Glenn* that applies an "abuse of discretion" standard. In any event, no aspect of this Court's ruling on the instant motions under an "arbitrary and capricious" standard would be altered by the use of an "abuse of discretion" standard.

court must determine whether the administrator's decision was "the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). A plan administrator's rational interpretation of a plan must be accepted, "even in the face of an equally rational interpretation offered by the participants." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004). This deference extends to the administrator's interpretation of "ambiguous and general terms" of a plan. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004).

The arbitrary and capricious standard of review is not, however, a mere "rubber stamp" of the plan administrator's decision. *Id.* at 661. "Deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith, and a conflict of interest by the decision-maker. *Toohig v. Nat'l City Corp. Amended and Restated Mgmt. Severance Plan*, No. 1:10 CV 657, 2011 WL 2456711, at *3 (N.D. Ohio June 16, 2011) (citing *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)). Similarly, a decision based upon a selective review of the record or an incomplete record is arbitrary and capricious. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005).

11

**B. Motions for Judgment on the Pleadings**

  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 55 U.S. 44, 47 (1957). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." Id. at 556, n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts").

  Under Rule 12(c), a party may move for judgment on the pleadings any time after the pleadings are closed but early enough not to delay trial. Fed. R. Civ. P. 12(c). The standard of review for a motion for judgment on the pleadings is the same as for a motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (citing *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998)).

  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations,

a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The district court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). "The motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991) (citation omitted).

## III. ANALYSIS

### A. Count I: Failure to Notify

In the first of two counts asserted in Mr. Fillingim's complaint, the Fund is accused of failing to notify Mr. Fillingim of purported material changes to the plan contained in the Special Bulletin. Mr. Fillingim alleges that this inaction violates 29 U.S.C. § 1024(b)(1), and he seeks to recover benefits under 29 U.S.C. § 1132(a)(1)(B) and/or to obtain appropriate equitable relief under § 1132(a)(3).

Section 1024(b) covers publication of summary plan descriptions, summaries of material modifications, and annual reports to the Department of Labor as well as the participants and beneficiaries of an ERISA plan. "Aware of the technical language frequently (and perhaps necessarily) used to define [ERISA] plans, Congress directed plan administrators to provide employees with a summary plan description that is 'sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan . . . .'" *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 428 (6th Cir. 2007) (quoting 29 U.S.C. § 1022(a)). Pursuant to the statute, updated summary plan descriptions must be furnished to each plan participant

13

and beneficiary every five years. 29 U.S.C. § 1024(b)(1).

With respect to plan amendments, the notice requirements are different. A plan can only be amended by the plan administrator through formal procedures set out in the plan documents. *Crosby*, 480 F.3d at 428; 29 U.S.C. § 1102(b)(3). If a plan is validly amended, "plan administrators need not immediately update and republish the summary plan document; they may instead furnish employees with a summary of material modifications ["SMM"] 'written in a manner calculated to be understood by the average plan participant . . . .'" *Id.* (quoting 29 U.S.C. § 1022(a)). Section 1024(b)(1) states requirements for providing an SMM to participants and beneficiaries. Specifically, in pertinent part:

> If there is a modification or change described in section 1022(a) of this title (other than a material reduction in covered services or benefits provided in the case of a group health plan (as defined in section 1191b(a)(1) of this title)), a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan.

29 U.S.C. § 1024(b)(1)(B). Section 1022(a) (formerly § 1022(a)(1)) circularly provides that "[a] summary of any material modification in the terms of the plan . . . shall be furnished in accordance with section 1024(b)(1) of this title."

Strangely, Mr. Fillingim contends both that the Special Bulletin was itself an amendment of the plan (*See* Doc. No. 1 at ¶ 42 (claiming that the Special Bulletin "contained plan amendments"); Doc. No. 21 at 1009 (claiming that the Special Bulletin "contained a material modification")) and that the Special Bulletin was an SMM that was not properly distributed to participants and beneficiaries of the plan (*See* Doc. No. 1 at ¶ 41; Doc. No 21 at 1009 (both claiming failure to provide notice of the Special Bulletin

14

violates the section of ERISA requiring provision of SMMs)). The Fund claims that the Special Bulletin was neither an SMM nor a plan amendment and did not need to be distributed because the plan had not yet been amended.[8]

The Special Bulletin, sent by the Trustees to local unions with YRC participants, discusses the steps to be taken by the Fund in evaluating whether to ratify the Restructuring Plan entered into by YRC and the Teamsters on September 24, 2011. AR at 481. The Trustees explain that, in making that decision, their financial consultants "will need time . . . to review [YRC's] books and records to independently verify that both the delay in reentry into the [] Fund and the contribution rate reductions of the magnitude set forth in the Restructuring Plan are necessary." AR at 481. Only then, if those conditions are deemed necessary, will benefit reductions "[c]learly . . . result[,]" and the Trustees would conduct an actuarial review to determine the precise amount of the reductions. AR at 481.

Mr. Fillingim misstates the content of the Special Bulletin. He contends that it "contain[s] information relating to imminent pension reduction[,]" despite the clear language that the Fund had yet to verify whether the terms of the Restructuring Plan were necessary. He also claims that "the contents of the [Special] Bulletin would have made [him] aware that the adjustable benefits would be lost." This is impossible: the Special Bulletin mentions that, *if* the Restructuring Plan were ratified, *some* benefit reductions will result. There is no mention of the amount or type of benefits that would be lost;

---

[8] Defendants deny that representatives of the Fund posted the Special Bulletin in the YRC break room (Doc. No. 10 at ¶ 19; Doc. No. 24 at 1039) and do not otherwise argue that they made any attempt to distribute it to Fillingim.

indeed, it is explicitly stated that an actuarial review of the impact of the newly-ratified conditions would be required to determine how much benefits would be reduced. Mr. Fillingim further claims that the contents of the Special Bulletin "rise above merely a warning." But they do not even rise that far: the only warning included therein is not a warning that benefit reductions are "imminent," but that union members could not avoid future benefit reductions, if they were to occur, by retiring beforehand, because the reductions would be retroactive to at least September 24, 2010. Nonetheless, Mr. Fillingim presents this as a warning "not to make any retirement decisions" whatsoever.[9]

In short, Mr. Fillingim's position is that the Special Bulletin should have been sent to him because it "contained material information regarding benefit modifications." But the notice requirements of 29 U.S.C. § 1024(b)(1), the section Mr. Fillingim accuses the Fund of violating, compel a plan administrator to provide notice of *actual* modifications to the plan, not *possible* ones. Because no modification had occurred, no summary of material modifications was necessary, and the Fund was under no obligation to send the Special Bulletin, which was not an amendment to the plan or an SMM, to its participants and beneficiaries. The Fund, having come to the same conclusion in denying Mr. Fillingim's claim for benefits, clearly did not act arbitrarily and capriciously.

Further, even if the plan had actually been modified as early as September 24, 2010, the effective date of the Restructuring Plan between YRC and the Teamsters,

---

[9] Moreover, even if benefit reductions were "imminent" on the day the Fund sent the Special Bulletin to local unions, Fillingim offers no authority for his conclusory implication that failure to notify him of imminent benefit reductions violates the requirements of § 1024(b)(1). Indeed, Fillingim's entire inadequate notice argument is presented almost entirely devoid of reference to case law interpreting the applicable statutory provisions.

the Fund still would have met the notice requirements of § 1024(b)(1), the section Count I of Mr. Fillingim's complaint accuses the Fund of violating. Under that section, notices of material modifications are to be furnished "not later than 210 days after the end of the plan year in which the change is adopted . . . ." The Fund's correspondence of March 30, 2011, sent well within 210 days of the end of 2010, provides ample notice of the benefit reductions related to the ratification of the Restructuring Plan. (*See* Doc. No. 18-4 at 482–87.)

Additionally, defendants properly point out that, in accordance with the PPA (29 U.S.C. § 1085(b)(3)(D)(i)) every year that the Fund had been certified as being in critical status under the provisions of the PPA, the participants, including Mr. Fillingim, were notified of the critical status of the Fund and also notified of possible loss of adjustable benefits. Additionally, as further required by the PPA (29 U.S.C. § 1085(e)(8)(C)(i)), the participants and beneficiaries, including Mr. Fillingim, were given notice at least 30 days before any reduction to adjustable benefits was to take effect. That Mr. Fillingim was provided theses required notices pursuant to the PPA, are facts that he neither disputes nor challenges. These were the notices that the Fund were required to provide and the Fund complied with these legal requirements.

Accordingly, with respect to Count I of Mr. Fillingim's complaint, defendants' motion for judgment on the administrative record is **GRANTED**, and Mr. Fillingim's motion for summary judgment is **DENIED**.

## B. Count II: Breach of Fiduciary Duty

The second and final count in Mr. Fillingim's complaint is against the individual defendants for breach of fiduciary duty as defined in 29 U.S.C. § 1104. Mr.

17

Fillingim does not identify in his complaint the ERISA enforcement provision(s)—that is, the subsection(s) of 29 U.S.C. § 1132—under which he brings this claim, but he is clear in his briefing that he seeks relief under 29 U.S.C. § 1132(a)(3). (Doc. No. 26 at 1073.) Defendants claim that a breach of fiduciary duty claim may only be brought under § 1132(a)(3) in the "limited circumstances" prescribed in *Varity Corp. v. Howe*, 516 U.S. 489 (1996). They interpret those circumstances to exist only where a remedy under § 1132(a)(1)(B) is unavailable. (Doc. No. 19-1 at 544.) Mr. Fillingim counters that a remedy under § 1132(a)(3) for breach of fiduciary duty is available where the plan administrator has engaged in "trickery" by making "misleading communications to plan participants regarding plan administration . . . ." (Doc. No. 21 at 1012 (citing *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992)).

Indeed, defendants are correct that a denial of benefits claim cannot be "repackaged" as a breach of fiduciary duty claim and brought under § 1132(a)(3). *Wilkins*, 150 F.3d at 616. However, the fact that an award of benefits under § 1132(a)(1)(B) would resolve an § 1132(a)(3) claim does not necessarily mean that the § 1132(a)(3) claim is a "repackaged" denial of benefits claim. *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 841 (6th Cir. 2007). A plaintiff may bring both a § 1132(a)(1)(B) claim for denial of benefits and a § 1132(a)(3) claim for breach of fiduciary duty where "the plaintiff s[eeks] recovery of benefits according to the plan terms as they were misrepresented to him by the defendant, rather than according to the actual terms of the plan." *Moss v. Unum Life Ins. Co.*, 495 F. App'x 583, 589 (6th Cir. Aug. 17, 2012) (citing *Gore*, 477 F.3d at 841–42). However, the court in *Moss* reaffirmed

that, "if § 1132(a)(1)(B) provides the entire remedy for a plaintiff's claims, then the plaintiff cannot also seek relief under § 1132(a)(3)." *Moss*, 495 F. App'x at 589.

Mr. Fillingim's breach of fiduciary duty is indeed a repackaging of his denial of benefits claim. He claims the same injury as a result of the alleged breach of fiduciary duty as from the alleged improper denial of benefits: the amount of his reduced pension, or $1,277.00 per month. Contrast the instant case with *Gore*, where the plaintiff was able to bring both claims because he claimed two separate injuries of different amounts: one for loss of benefits according to the plan as written, and a second for loss of benefits according to the plan as allegedly misrepresented to him by the plan administrator. *Gore*, 477 F.3d at 841. Gore's claims were "distinct and unrelated to each other," *id.*; Mr. Fillingim's are exactly the same.

Because § 1132(a)(1)(B) provides the entire remedy for Mr. Fillingim's claims, he cannot seek relief for breach of fiduciary duty under § 1132(a)(3). Accordingly, with respect to Count II, defendants' motion for judgment on the pleadings is **GRANTED**, plaintiff's motion for judgment on the administrative record is **DENIED**, and defendants' motion for judgment on the administrative record is **DENIED as MOOT**.

### IV. CONCLUSION

For the foregoing reasons, defendants' motion for judgment on the pleadings, which pertains only to Count II of the complaint, is **GRANTED**. Defendants' motion for judgment on the administrative record is **GRANTED** with respect to Count I and **DENIED as MOOT** with respect to Count II. Plaintiff's motion for judgment on the

administrative record is **DENIED** as to both counts. This case is **DISMISSED**.

                                **IT IS SO ORDERED**.

Dated: September 30, 2013

                                        **HONORABLE SARA LIOI**
                                        **UNITED STATES DISTRICT JUDGE**